## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**REGIONS BANK,**

     **Plaintiff,**

v.                            **Case No.: 8:16-cv-2867-T-23AAS**

**MARVIN I. KAPLAN, et al.,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Before the undersigned are Plaintiff's **Motion for Preliminary Injunction and Supporting Memorandum of Law** (Doc. 35), the Kaplan Parties'[1] **Response to Regions Bank's Motion for Preliminary Injunction** (Doc. 44), Plaintiff's **Reply Memorandum in Support of Motion for Preliminary Injunction** (Doc. 72), and the Kaplan Parties' **Sur-Reply to Regions' Reply** (Doc. 78).[2]  Advanta and Mainstar did not respond in opposition to Plaintiff's Motion for Preliminary Injunction.  For the reasons that follow, the undersigned recommends the Court grant the Motion for Preliminary Injunction.

## I.    Background

In 2012, Plaintiff filed a Complaint against Marvin I. Kaplan and various entities, including the Kaplan Entities, *see supra* n.1, and the case was removed to federal court. *See Regions Bank*

---

[1] Defendants in this case are Marvin I. Kaplan ("M. Kaplan") and Kathryn N. Kaplan ("K. Kaplan") (together, "the Kaplans"); R1A Palms, LLC ("R1A"), Triple Net Exchange, LLC ("TNE"), MK Investing, LLC ("MKI"), BNK Smith, LLC ("BNK"), (collectively,"Kaplan Entities"); and MIK Advanta, LLC ("MIKA"), Advanta IRA Services, LLC ("Advanta"), and Mainstar Trust ("Mainstar").  The "Kaplan Parties" are the Kaplans, the Kaplan Entities, and MIKA.

[2] The district judge referred this matter to the undersigned for consideration and a Report and Recommendation. (Doc. 49).  *See* Local Rule 6.01(a), M.D. Fla.

*v. Marvin I. Kaplan, et al.*, No. 8:12-cv-1837-T-17MAP ("2012 Action") at Doc. 1. Plaintiff asserted claims for breach of contract, refund, reimbursement, indorser liability, conversion, and fraudulent concealment, among other claims, against the Kaplan Entities, along with tort claims against M. Kaplan and the Kaplan Entities. *2012 Action* at Doc. 671. On April 18, 2016, the Court granted summary judgment in favor of Plaintiff on its claims against the Kaplan Entities for their breach of deposit agreement, their obligations of reimbursement and refund under Florida Statutes Sections 674.2141 and 673.4151, and their obligations as indorsers. *Id.* at Doc. 652. After a multi-day bench trial held in May 2016, the Court took the tort claims under advisement, and the claims remain pending at the time of this report and recommendation. *Id.* at Doc. 757.[3]

On October 11, 2016, Plaintiff filed the instant action against Defendants. (Doc. 1). In Plaintiff's Amended Complaint (Doc. 29), filed January 17, 2017, Plaintiff alleges claims against Defendants for damages for actual and constructive fraudulent transfers and for injunctive relief, pursuant to Sections 726.105, 726.106, and 726.108, Florida Statutes, in connection with transfers of funds and assets from the R1A, TNE, and BNK to Kathryn Kaplan and from MKI to MIKA.

On January 30, 2017, Plaintiff filed the instant Motion for Preliminary Injunction. (Doc. 35). Pursuant to Section 726.108(1)(c)(1), Florida Statutes, Rule 65(a) of the Federal Rules of Civil Procedure, and Local Rule 4.06, M.D. Fla., Plaintiff seeks a preliminary injunction precluding Defendants from undertaking further transfers of assets.

---

[3] Following the trial, litigation has continued in the 2012 Action with regard to, among other things, post-trial briefing and defaulted parties' liability for damages on cross-claims. *2012 Action* at Docs. 752-819. Most recently, in April 2017, M. Kaplan and the Kaplan Entities filed, in the 2012 Action, a motion to redact the bench trial transcript, *id.* at Doc. 816, to which Plaintiff filed a response in opposition on May 10, 2017. *Id.* at Doc. 819.

## II.   **Findings of Fact**

1.    The Kaplan Entities are liable to Plaintiff in the underlying action, *Regions Bank v. Marvin I. Kaplan, et al.*, No. 8:12-cv-1837-EAK-MAP, for damages, costs, interest, and attorneys' fees on Plaintiff's claims for breach of contract, transfer liability warranty, chargeback/refund, indorser liability, and negligence/negligent misrepresentation. *2012 Action* at Doc. 652.

2.    M. Kaplan owns and manages a self-directed IRA. (Doc. 41 Exs. 1 at 53; 7 at 2).

3.    Advanta is the administrator of the IRA. (Doc. 41 Ex. 7 at 2, 7, 15).

4.    Mainstar is the custodian of the IRA. (Doc. 36 Ex. 11 at 2).

5.    The Kaplans (M. Kaplan and his wife, K. Kaplan) jointly own 100 percent of R1A and TNE (Docs. 41 Ex. 7 at 38; 42 Ex. 2 at 15, 35) and M. Kaplan is the sole manager of those entities. (Doc. 41 Ex. 7 at 39, 43).

6.    The Kaplans jointly own 50 percent of BNK; the other 50 percent is owned by an individual named Stanley Browne. (Docs. 41 Ex. 7 at 40; 42 Ex. 2 at 49).  M. Kaplan and Stanley Browne co-manage BNK. (Doc. 41 Ex. 7 at 45).

7.    Additionally, the Kaplan Entities each own units of another entity, Devonshire Park Holdings ("DPH"), as follows:

    a.   R1A owns 56.701% of DPH;

    b.   TNE owns 21.685% of DPH;

    c.   BNK owns 5.461% of DPH; and

    d.   MKI owns 14.617% of DPH.[4]

---

[4] The remaining 1.536% is owned by another entity, 715 Holdings, LLC. (Doc. 41 Ex. 4 at 12).

(Doc. 41 Exs. 4 at 12; 7 at 47-48).

8.      Among other activities, the IRA may acquire interests in other entities and in real estate, and the IRA may make loans. (Doc. 41 Ex. 7 at 6-8, 10, 12).

9.      In April 2010, the IRA acquired 100 percent of MKI's units. (Doc. 41 Ex. 1 at 55-57).

10.     In July 2012, M. Kaplan formed 785 Holdings, LLC ("785 Holdings"), in Delaware, which was owned at least in part by MKI. (Docs. 36 Ex. 14; 41 Ex. 7 at 23).

11.     On August 1, 2012, MKI sold 71,724.2 units for $106,022.30 in cash paid to the IRA. (Doc. 41 Ex. 1 at 61).  On October 1, 2012, MKI sold 57,379.36 units for $90,413.00 in cash paid to the IRA. (*Id.*).  The two sales totaled 129,103 units for $196,435.30 in cash paid to the IRA. (*Id.*).

12.     On October 1, 2012, MKI distributed $13,832.00 in cash to the IRA. (Doc. 41 Ex. 1 at 61).

13.     On October 8, 2012, M. Kaplan formed MIKA in Florida. (Doc. 36 Ex. 16).  M. Kaplan was the sole manager. (*Id.*).

14.     On October 16, 2012, MKI distributed another $4,446.00 in cash to the IRA, which, when combined with the October 1, 2012 distribution, totaled $18,278.00 in distributions to the IRA in October 2012. (Doc. 41 Ex. 1 at 61).

15.     On October 22, 2012, the following transactions occurred:

   a.   the IRA acquired 100 percent of MIKA's units, paying $214,263.16 in cash to MIKA. (Doc. 41 Ex. 1 at 61);

   b.   the IRA assigned the remaining units of MKI to MIKA (229,517.44 units, valued at $273,898.08) (Doc. 41 Ex. 1 at 63), for which MKI received no value; and

   c.   the IRA transferred 100 percent ownership in 785 Holdings to MIKA (valued at

$370,500.00) for which MKI received no value (Docs. 41 Ex. 1 at 68; 41 Ex. 7 at 25-26;[5] 42 Ex. 2 at 1).

16.    At some point around the time frame of the October 2012 transactions, MKI ceased doing business. (Doc. 41 Ex. 7 at 30-31).

17.    On January 8, 2015, DPH distributed $49,500.00 to TNE. (Doc. 41 Ex. 5 at 1, 47).

18.    On January 9, 2015,[6] TNE transferred $49,500.00 to K. Kaplan. (Doc. 41 Ex. 5 at 2).

19.    On January 16, 2015, DPH distributed $10,500.00 to TNE. (Doc. 41 Ex. 5 at 1, 47).

20.    On January 20, 2015,[7] TNE transferred $10,500.00 to K. Kaplan. (Doc. 41 Ex. 5 at 1-2, 47-48).

21.    On February 9, 2015, DPH distributed $187,113.30[8] to R1A. (Doc. 41 Ex. 4 at 24).

22.    On February 9, 2015,[9] DPH distributed $71,560.50 to TNE. (Doc. 41 Exs. 4 at 24; 5 at 49).

23.    On February 27, 2015, TNE distributed $71,000.00 to K. Kaplan. (Doc. 41 Ex. 5 at 9, 35).

24.    On February 28, 2015, R1A transferred $187,000.00 to K. Kaplan. (Doc. 41 Exs. 4 at 29;

---

[5] M. Kaplan testified that he did not remember what the consideration was for the sale. (Doc. 41 Ex. 7 at 25-26).

[6] A copy of the check shows the check was written on January 8, 2015, and the account statement shows the check was deposited on January 9, 2015. (Doc. 41 Ex. 5 at 1-2, 47-48).

[7] A copy of the check shows the check was dated January 15, 2015, but the account statement shows the check was deposited January 20, 2015. (Doc. 41 Ex. 5 at 1-2, 47-48).

[8] Although Plaintiff states that DPH distributed $187,116.09 to R1A on February 20, 2015, the cited exhibit, a handwritten check ledger, shows DPH distributed $187,113.30 to R1A on February 9, 2015. (Doc. 41 Ex. 4 at 24). Plaintiff apparently confused the February 9, 2015 distribution of $187,113.30 to R1A from DPH with another check written by R1A to itself on February 19, 2015, for $187,116.09 to close R1A's bank account. (Doc. 41 Ex. 5 at 30).

[9] Plaintiff states that DPH made the distribution on February 10, 2015, but the handwritten checkbook ledger shows the distribution was made on February 9, 2015. (Doc. 41 Ex. 4 at 24).

5 at 19).

25.   On October 9, 2015, the following transactions occurred:

    a.   DPH distributed $286,907.06 to R1A. (Doc. 41 Ex. 4 at 19).

    b.   R1A transferred $286,994.86[10] to K. Kaplan. (Doc. 41 Ex. 5 at 27).

    c.   DPH distributed $109,759.67 to TNE. (Doc. 41 Ex. 4 at 19).

    d.   TNE transferred $109,759.67 to K. Kaplan. (Doc. 41 Ex. 5 at 11, 46).

    e.   DPH distributed $27,632.66 to BNK. (Doc. 41 Ex. 4 at 19).

    f.   BNK transferred $27,768.47 to K. Kaplan. (Doc. 41 Ex. 5 at 13, 58).

    g.   DPH distributed $73,962.02[11] to MKI. (Doc. 41 Exs. 4 at 19; 5 at 14).

    h.   MKI distributed $73,973.21 to MIKA. (Doc. 41 Ex. 5 at 14).

26.   Although M. Kaplan states that the 2015 cash transfers to K. Kaplan may have been a loan, M. Kaplan did not know if there was a promissory note, did not know when the loan matured, and, although he believed K. Kaplan paid the loan back, M. Kaplan did not know when she did so. (Doc. 41 Ex. 7 at 64-65, 69-70, 75-76, 148-49).

27.   TNE, BNK, and R1A did not operate in 2014 other than having bank accounts and owning a piece of real property through DPH. (Doc. 41 Ex 7 at 81).

28.   The transfers that occurred in 2015 depleted the cash resources of TNE, BNK, and R1A. (*See* Docs. 41 Ex. 5 at 15-59 (bank statements from January 2015 forward); 41 Ex. 6 at 1-2 (same)).

---

[10] While Plaintiff states that R1A transferred $286,907.06 to K. Kaplan on October 9, 2015, a copy of the check shows R1A transferred $286,994.86. (Doc. 41 Ex. 5 at 27).

[11] Plaintiff states that M. Kaplan caused DPH to distribute $73,973.21 to MKI on October 9, 2015. However, the handwritten check ledger shows $73,962.02 was paid from DPH and deposited into MKI's account from DPH. (Doc. 41 Exs. 4 at 19; 5 at 14).

29.   M. Kaplan is continually engaged in an asset protection plan, through which, among other activities, M. Kaplan places assets in K. Kaplan's name, rather than his own. (Docs. 41 Ex. 7 at 112-16).

30.   As described herein, M. Kaplan has engaged in a consistent practice of moving funds and other assets out of the names of the Kaplan Entities and to MIKA and K. Kaplan.

31.   K. Kaplan used some of the money transferred to her to pay M. Kaplan's debts. (Doc. 41 Ex. 7 at 121-23).

32.   Plaintiff did not learn of the IRA restructuring or the Kaplan Entities' 2015 cash transfers until May 2016 when the District Judge in the 2012 Action ordered disclosure of the Kaplan Parties' assets for the punitive damages phase of trial. *2012 Action* at Doc. 738.

33.   The 2012 Action remains pending at the time of this report and recommendation.

## III.   <u>Conclusions of Law</u>

Florida law provides that, "[i]n an action for relief against a transfer or obligation under [sections] 726.101-726.112, a creditor . . . may obtain: . . . An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[.]" Fla. Stat. 726.108(1)(c)(1).

The Court may grant injunctive relief only if the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent injunctive relief; (3) that the threatened injury to the movant outweighs the harm that the proposed injunction may cause the opposing party; and (4) that the proposed injunction is not adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s]

the 'burden of persuasion' as to each of the four prerequisites." *Id.*

### A. Likelihood of Success on the Merits

As summarized above, Plaintiff alleges that the Kaplan Parties have engaged in actual and constructive fraudulent transfers, pursuant to Florida Statutes Sections 726.105 and 726.106.

#### 1. Actual fraud

Section 726.105 of the FUFTA provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Section 726.105(1)(a), Fla. Stat.  As to each transfer, Plaintiff must establish three elements to prevail on its Section 726.105(1)(a) claim: (1) Plaintiff was a creditor; (2) the Kaplan Parties intended to commit the fraud; and (3) "the fraud involved a conveyance of property that could have been applicable to the payment of the debt due." *Dillon v. Axxsys Int'l, Inc.*, 185 F. App'x 823, 828-29 (11th Cir. 2006) (citing *Nationsbank, N.A. v. Coastal Utilities, Inc.*, 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002)).  Here, Plaintiff is likely to succeed on the merits of its claim under Section 726.105(1)(a).

As an initial matter, the Kaplan Parties challenge that IRA accounts, and thus the funds and assets held by MKI, are exempt from collection by creditors pursuant to Florida law.  Section 222.21(2)(a), Fla. Stat., provides that "money or other assets payable to an owner, a participant, or a beneficiary from, or any interest of any owner, participant, or beneficiary in, a fund or account is exempt from all claims of creditors of the owner, beneficiary, or participant" under certain circumstances.  However, in this case, Plaintiff's claim is against MKI itself for breach of contract,

8

transfer liability warranty, chargeback/refund, indorser liability, and negligence/negligent misrepresentation. *See 2012 Action* at Doc. 652. Therefore, the funds and assets held by MKI are not exempt under Section 222.21(2)(a), as Plaintiff's claims are not claims of a creditor of the IRA owner, beneficiary, or participant, but rather are claims of MKI's own creditor.

The Kaplan Parties also argue that DPH is not indebted to Regions, thus the transfers from DPH were not fraudulent. However, The Kaplan Parties' argument is misplaced. The issue is not whether DPH properly transferred funds to the Kaplan Entities, but whether the subsequent transfers from the Kaplan Entities to K. Kaplan and MIKA were fraudulent under Florida law.

Next, addressing the elements required by Section 726.105(1)(a), Fla. Stat., Plaintiff is a creditor under the meaning of the statute. The FUFTA defines "creditor" as one "who has a claim." Fla. Stat. § 726.102(5). "'Claim' means a right to payment, *whether or not the right is reduced to judgment*, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Fla. Stat. § 726.105(4) (emphasis added). Although no judgment has yet been entered in the underlying action, the Court granted summary judgment in favor of Plaintiff and against the Kaplan Entities, including MKI; therefore, Plaintiff satisfies the definition of "creditor."

As to the second element, the FUFTA identifies several factors, known as "badges of fraud," to consider in determining "whether the circumstantial evidence supports . . . an inference of intent." *In re Toy King Distribs., Inc.*, 256 B.R. 1, 128 (Bankr. M.D. Fla. 2000). The factors to be considered are whether:

> (a)   The transfer or obligation was to an insider.
> (b)   The debtor retained possession or control of the property transferred after the transfer.
> (c)   The transfer or obligation was disclosed or concealed.

      (d)      Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

      (e)      The transfer was of substantially all the debtor's assets.

      (f)      The debtor absconded.

      (g)      The debtor removed or concealed assets.

      (h)      The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

      (i)      The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

      (j)      The transfer occurred shortly before or shortly after a substantial debt was incurred.

      (k)      The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2).

As Plaintiff avers, the 2012 and 2015 transfers from MKI to MIKA and the 2015 cash transfers from TNE, BNK, and R1A to K. Kaplan likely satisfy multiple badges of fraud and, therefore, are indicative of fraudulent intent. For example, once MIKA acquired MKI's remaining membership units, MIKA became the parent company to MKI; therefore, transfers from MKI to MIKA were transfers to an insider. Fla. Stat. § 726.105(2)(a) (evidence of intent includes transfer to an insider[12]). The 2015 cash transfers to K. Kaplan from TNE, BNK, and R1A were also transfers to an insider, as M. Kaplan controlled the Kaplan Entities, the definition of "insider" includes "[a] relative of a general partner, director, officer, or person in control of the debtor," Fla. Stat. §§ 726.102(8)(b)(6); 726.102(13), and K. Kaplan is M. Kaplan's spouse.

Additionally, as M. Kaplan manages the IRA, which owns both MKI and MIKA, Section 726.105(2)(b), Fla. Stat. (evidence of intent exists where "[t]he debtor retained possession or

---

[12] The definition of "insider" under FUFTA includes an "affiliate," Fla. Stat. § 726.102(8)(d), which the statute defines as "[a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor[.]" Fla. Stat. § 726.102(1)(b).

control of the property transferred after the transfer"), is arguably satisfied.  Similarly, while the transfers from TNE, BNK, and R1A were to K. Kaplan, not M. Kaplan, Plaintiff points to evidence demonstrating that M. Kaplan retained control. For example, M. Kaplan admitted that he asks his wife to write checks in accordance with his instructions (Doc. 41 Ex. 7 at 145-46) and that K. Kaplan used some of the money transferred to her to pay M. Kaplan's debts (Doc. 41 Ex. 7 at 121-23).

Plaintiff also asserts that it discovered the IRA restructuring and 2015 cash transfers only upon the District Judge's order in the underlying action that required the Kaplan Parties to disclose their assets for the punitive damages phase of the trial, *see 2012 Action* at Doc. 738, thereby implicating Sections 726.105(2)(c),(g), Fla. Stat. (evidence of fraudulent intent where the transfer was concealed and where assets were removed or concealed).  On the issue of concealment, Plaintiff also points to M. Kaplan's testimony at trial in the underlying action, during which M. Kaplan testified that MKI and MIKA were unconnected other than one loan transaction. (Doc. 41 Ex. 7 at 140).

Another factor in inferring intent is whether the debtor had been sued or threatened with suit before the transfer occurred. Fla. Stat. § 726.105(2)(d).  Here, Plaintiff sued the Kaplan Parties in the underlying lawsuit in 2012, before the transfers at issue occurred.  Moreover, as determined above, the transfers to K. Kaplan depleted the financial resources of R1A, TNE, and BNK, and MKI transferred its membership units, cash, and ownership in 785 Holdings to MIKA and ceased doing business around the time frame of the October 2012 restructuring transfers, thus implicating Section 726.105(2)(e), Fla. Stat. (evidence of fraudulent intent where "[t]he transfer was of substantially all the debtor's assets.").

11

As these examples indicate, Plaintiff has presented evidence that numerous factors weigh in favor of a finding of actual fraudulent intent, pursuant to Section 726.105(2), Fla. Stat.

As for the third element—a transfer of property that could have been applicable to payment of the debt due—the Kaplan Parties contend that the transfers of funds and assets from MKI to MIKA are not "transfers" within the meaning of the statute.  This argument is not persuasive. Pursuant to the FUFTA, the term "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Fla. Stat. § 726.102(14).  The Kaplan Parties assert that because the IRA merely transferred assets from MKI (which had been acquired by the IRA) to cash within the IRA and then to MKI, and because MKI merely assigned its own remaining units and its interest in 785 Holdings to MIKA (which had also been acquired by the IRA), the IRA never relinquished control, thus the IRA did not part with an asset(s).[13]

However, in light of the fact that Plaintiff has a claim against MKI, the question in this instance is not whether *the IRA* parted with an asset(s), but whether *MKI* parted with an asset(s). As detailed in the factual findings above, MKI distributed cash to the IRA (which, in turn, transferred funds to MIKA) and assigned its remaining units and its interest in 785 Holdings to MIKA.  Because MKI disposed of or parted with an interest in the cash and membership units, the transactions constitute "transfers" under the statute.

For the reasons explained above, Plaintiff is substantially likely to succeed on the merits of its claims for actual fraud, pursuant to Section 726.105(1)(a), Fla. Stat., with regard to the

---

[13] The parties do not dispute that the funds or membership units transferred constitute "assets" within the meaning of the statute.

12

transfers at issue.

    2.    <u>Constructive Fraud</u>

Plaintiff is also substantially likely to succeed on the merits of its claims that the transfers were constructively fraudulent under Sections 726.105(1)(b) and 726.106(1), Fla. Stat.

As to constructively fraudulent transfers, Section 726.105(1)(b) of the FUFTA provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . . (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla Stat. § 726.105(1)(b). Additionally, Section 726.106 of the FUFTA provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Fla. Stat § 726.106(1).

As described above, for the purposes of FUFTA, Plaintiff is a creditor whose claims arose before MKI transferred its assets to MIKA and before the 2015 cash transfers from R1A, TNE, and BNK to K. Kaplan. Notwithstanding the overdraft owed by MKI to Plaintiff, as noted above, evidence demonstrates that MKI received no value for the transfers and that MKI ceased doing business around the time of the October 2012 transfers. Additionally, as noted above,

notwithstanding the overdrafts owed by R1A, TNE, and BNK to Plaintiff, those entities transferred funds to K. Kaplan in 2015 without receiving equivalent value and resulting in depleted cash resources.  Accordingly, it is substantially likely that Plaintiff will satisfy the requirements of and succeed on the merits of its claims under Sections 726.105(1)(b) and 726.106(1), Fla. Stat.

However, while Plaintiff is likely to succeed on the merits of its claims, the Court's inquiry does not end there.  Plaintiff must also satisfy its burden of persuasion as to the remaining three prerequisites: that Plaintiff will suffer irreparable harm absent preliminary injunctive relief, that the threatened injury to Plaintiff outweighs the harm that the proposed injunction may cause the Kaplan Parties, and that the proposed injunction is not adverse to the public interest. *Siegel*, 234 F.3d at 1176.

### B.    Irreparable Harm

Plaintiff contends that it will suffer irreparable harm in the absence of a preliminary injunction, pointing to M. Kaplan's numerous transfers from the Kaplan Entities to MIKA and K. Kaplan.  The Kaplan Parties, on the other hand, challenge that Plaintiff seeks monetary damages as a remedy and that, therefore, there is no irreparable harm and a preliminary injunction freezing the Kaplan Parties' assets is inappropriate.

"It is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity." *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994). *See also Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322-24 (1999) (injunctive relief precluded when action is solely at law).  But in this case, the relevant statute provides for, and Plaintiff specifically requests, injunctive relief. *See* Fla. Stat. § 726.108(1)(c)(1);

14

(Doc. 48). *See also Grupo*, 527 U.S. at 324-26 (distinguishing suits demanding statutorily provided equitable relief from suits seeking "equitable assistance in the collection of a legal debt").

Additionally, "[a] request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). Thus, a preliminary injunction is a remedy available to Plaintiff in this case, so long as Plaintiff satisfies its burden of persuasion as to the prerequisites described above.

The Kaplan Parties also contend that Plaintiff has made no effort to establish irreparable harm, as Plaintiff "offers no proof to support [the] speculative assertion" that the Kaplan Parties will continue to transfer assets out of Plaintiff's reach. (Doc. 35 at 24). However, the Court has granted summary judgment in favor of Plaintiff and against the Kaplan Entities in the underlying action. *2012 Action* at Doc. 652. Thus, it is clear that Plaintiff is a creditor of the Kaplan Entities and the Kaplan Entities are indebted to Plaintiff for significant sums.[14]

Plaintiff's assertion that the Kaplan Parties will continue to transfer assets is not speculative, as Plaintiff offers sufficient proof that the *modus operandi* employed by M. Kaplan, who controls each of the Kaplan Entities and MIKA, is to swiftly move funds out of his name and the names of the Kaplan Entities. In support, Plaintiff painstakingly details the numerous transactions at issue, demonstrating a consistent pattern by M. Kaplan of moving funds out of the Kaplan Entities' names and out of Plaintiff's reach. In fact, review of the transcript citations

---

[14] The undersigned declines to presume the amount of the Kaplan Entities' indebtedness to Plaintiff, as the judgment has not yet been entered in the underlying action. It is worth noting, however, that Plaintiff provides evidence that the amounts of the overdrafts for each Kaplan Entity are as follows: R1A $3,366,007.52, TNE $1,689,590.03, MKI $1,178,923.79, and BNK $164,379.01. (Doc. 41 Ex. 1 at 10-13, 24, 34-36, 38, 46-47, 49, 51).

provided by Plaintiff reveals M. Kaplan's cavalier attitude about transferring funds out of the reach

of Plaintiff.   For example, during trial in the underlying 2012 Action, the following exchange

occurred between M. Kaplan and opposing counsel regarding the sale of an ice rink, for which M.

Kaplan received approximately $671,000 in cash:

>  Q.      . . . Okay. What did you do with the cash?
>  A.      I gave it to my lovely spouse.
>  Q.      In her separate bank account?
>  A.      Yes.
>  Q.      And what did you tell her to do with it?
>  A.      Sit on it.
>  Q.      Sit on it. So it's still there as we speak?
>  A.      It is today.
>  Q.      I have learned to pay attention to your words. So you said it
>          is today. Does that mean tomorrow it's gone?
>  A.      Yeah, it could be.
>  . . . .
>  Q.      What's your plan, sir, for the 600K?
>  A.      I'm not sure yet.
>  Q.      Wouldn't want to send that money over to Regions to reduce
>          the overdraft, would you?
>  A.      Ah, I don't think so.

(Doc. 41 Ex. 7 at 125-26).[15]

Under these circumstances, the undersigned finds Plaintiff has surpassed mere speculative

allegations and adequately demonstrated that it will suffer irreparable harm absent the Court's

imposition of a preliminary injunction.[16]

---

[15] Although this exchange was contained in exhibits filed under seal, much of the exchange was
quoted in Plaintiff's Motion for Preliminary Injunction. (Doc. 35 at 17).

[16] Plaintiff learned of the transfers at issue in May 2016 after the District Judge in the 2012 Action
ordered disclosure of the Kaplan Parties' assets for the punitive damages phase of trial. *2012 Action*
at Doc. 738.  Plaintiff filed the instant fraudulent transfer action in October 2016, but waited until
January 30, 2017 to file its motion for preliminary injunction. (Docs. 1, 35).   The undersigned
notes that, often, "[a] delay in seeking a preliminary injunction of even only a few months . . .
militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244,
1248 (11th Cir. 2016).  This is because "[a]n unexplained delay undercuts any sense of urgency

C.      **Balance of the Harms and Public Interest**

The final two prerequisites for the imposition of a preliminary injunction require Plaintiff to demonstrate that the threatened injury to Plaintiff outweighs the harm that the proposed injunction may cause the Kaplan Parties and that the proposed injunction is not adverse to the public interest. *Siegel*, 234 F.3d at 1176.

The Kaplan Parties, again, contend that Plaintiff makes no effort to address these factors. The Kaplan Parties' argument is unavailing, as Plaintiff asserts that it will be harmed by further illegal, fraudulent transfers by the Kaplan Parties and that the Kaplan Parties will not be harmed because they have no right to continue fraudulently transferring assets.

The Kaplan Parties also assert that they will be harmed by restraint on the Kaplan Parties' ability to do business and legally transfer assets.   However, Plaintiff has presented sufficient evidence to support the determination that it is substantially likely to succeed on the merits of its claims for actual and constructive fraud and has sufficiently demonstrated a consistent pattern of transfers, orchestrated by M. Kaplan, that intentionally move assets out of Plaintiff's reach.  The undersigned is persuaded that the threatened injury to Plaintiff is real and imminent, and that such threatened injury outweighs the harm that a preliminary injunction may cause the Kaplan Parties.

Additionally, while the Kaplan Parties allege an inability to conduct business, the proposed

---

and can lead a court to find that the plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Pals Group, Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017).  Importantly, however, a delay is "not necessarily fatal" to a finding of irreparable harm. *Wreal*, 840 F.3d at 1248 (suggesting that the record may provide justification for delay in some circumstances).  Here, the Kaplan Parties do not even raise the issue of—much less challenge—the delay, and given the relatively active docket in this case and the continued and active litigation in the underlying 2012 Action, *see supra* n.3, the undersigned finds that the delay of approximately three and a half months between the commencement of the instant action and Plaintiff's motion for preliminary injunction does not weigh heavily against a finding of irreparable harm.

preliminary injunction restrains transfer of only those funds and assets relevant to the allegedly fraudulent transfers at issue in this case; the proposed preliminary injunction is silent regarding, and thus otherwise permits, transfers of remaining funds or assets, if any, that are not implicated by the alleged fraudulent transfers, as long as any such transfers, themselves, are not fraudulent. (Doc. 36 Ex. 1).  Therefore, the proposed preliminary injunction is not an unlimited freeze of all assets of the Kaplan Parties, but strikes a balance between preventing irreparable harm to Plaintiff (by preventing further dissipation of the Kaplan Entities' assets) and permitting the Kaplan Parties to continue to conduct business in some fashion.

With regard to the public interest prerequisite, Plaintiff argues that enforcement of the FUFTA statute necessarily serves the public interest and notes that the Kaplan Parties merely allege private, rather than public, interests.[17] The undersigned agrees. *See e.g.*, *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) (enforcing a statute "serve[s] the public interest almost by definition.").

### D.  Bond

Plaintiff contends that no security is required because it has made a high showing of succeeding on the merits of its claims.  The Kaplan Parties, on the other hand, assert generally that Plaintiff must post a bond if the preliminary injunction is granted; however, the Kaplan Parties fail to specify an appropriate bond amount.

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

---

[17] The Kaplan Parties merely argue that the Kaplan Parties should not be restrained from transferring assets and doing business. (Doc. 44 at 8).

or restrained." Fed. R. Civ. P. 65(c).  "The purpose of a bond is to provide security to the enjoined party in the event that the injunction was wrongly issued." *Edge Systems, LLC v. Aguila*, 2015 WL 12868177, at *14 (S.D. Fla. 2015).  However, the amount of any bond is a matter within the discretion of the Court. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 971 (11th Cir. 2005).

Given the purpose of the bond requirement and the harm that the Kaplan Parties contend the imposition of a preliminary injunction will inflict, the undersigned recommends the imposition of a bond in this case.  As this opinion is rendered as a report and recommendation, the parties will have fourteen days to file written objections.  The undersigned encourages the parties to confer during the objection period to reach an agreement on the appropriate amount of bond.  The parties shall advise the District Judge of any agreement, or of their respective positions in absence of an agreement, by the end of the fourteen day objection period.

## IV.    <u>Conclusion</u>

For the forgoing reasons, it is **RECOMMENDED** that:

(1)     Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Law (Doc. 35) be **GRANTED**;

(2)     during the pendency of the injunction and until further order of the Court:[18]

---

[18] The recommended restrictions are adopted from Plaintiff's proposed preliminary injunction. (Doc. 36 Ex. 1 at 8).  While the Kaplan Parties opposed injunctive relief generally, the Kaplan Parties did not lodge any specific objections as to the scope or individual restrictions contained in the proposed preliminary injunction (Doc. 36 Ex. 1), which Plaintiff filed the same day as the motion.

(a)     M. Kaplan, the Kaplan Entities, Advanta, and Mainstar,[19] together with their officers, agents, servants, employees, and attorneys, be prohibited from transferring, negotiating, granting a lien or interest in, or otherwise conveying any right, title or interest in any asset, personal or real property, in the amount of $932,634.45[20] plus interest from MKI, MIKA or the IRA;

(b)     The Kaplan Parties, together with their officers, agents, servants, employees, and attorneys, be prohibited from transferring, negotiating, granting a lien or interest in, or otherwise conveying any right, title or interest in any asset, personal or real property, in the amount of $742,523.00,[21] plus interest; and

(c)     The Kaplan Parties, together with their officers, agents, servants, employees, and attorneys, be prohibited from conducting any further transfers that are actually or constructively fraudulent as to Regions; and

(3)     by the close of the fourteen day objections period, the parties shall advise the District Judge, through a filing on the case docket, of their positions on the issue of bond.

---

[19] As already noted, Advanta and Mainstar, while named in the motion for preliminary injunction (Doc. 35), have filed no opposition to the motion or to the imposition of Plaintiff's proposed preliminary injunction against them.

[20] As Plaintiff describes, the number derives from the $858,661.24 that Plaintiff alleges was fraudulently transferred pursuant to the IRA restructuring in 2012 and the $73,973.21 MKI transferred to MIKA in 2015. *See supra* pp. 4-6 ¶¶ 15, 25(h).

[21] Although Plaintiff seeks restraint of $742,229.39, the undersigned notes that R1A transferred $286,994.86, rather than $286,907.06, to K. Kaplan on October 9, 2015. *See supra* n. 10.  Thus, $742,523.00 is the total amount of the transfers to K. Kaplan from TNE, R1A, and BNK. *See supra* pp. 5-6, ¶¶ 18, 20, 23, 24, 25(b),(d),(f).

**Date:  May 12, 2017.**

_Amanda Arnold Sansone_

AMANDA ARNOLD SANSONE
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. _See_ 28 U.S.C. § 636(b)(1).

Copies to:
Counsel of Record
District Judge

21