UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REGIONS BANK,

    Plaintiff,

v.                                                    CASE NO. 8:16-cv-2867-T-23AAS

MARVIN I. KAPLAN, et al.,

    Defendants.
_____/

## **FINDINGS OF FACT, CONCLUSIONS OF LAW, and DIRECTIONS TO THE CLERK**

Between 2010 and 2012, three companies owned by Marvin Kaplan and his wife, Kathryn, incurred millions of dollars in debt to Regions Bank. After years of bitter dispute in *Regions Bank v. Marvin I. Kaplan, et al.*, *case no.* 8:12-cv-1837 (M.D. Fla.), Regions won judgments totaling several million dollars against the companies, which the parties call the "Kaplan entities."[1] During the 2012 action but before the judgments, Regions discovered that the Kaplan entities transferred more than $700,000 to Kathryn. Also, Regions discovered that MK Investing (MKI), a company owned by Marvin's self-directed IRA and managed by Marvin, transferred more than $600,000 in assets (including nearly $215,000 in cash and an interest

---

[1] Regions won a judgment against R1A Palms for $4,308,407.83; against Triple Net Exchange (TNE) for $2,157,103.73; and against BNK Smith for $212,864.24. Also, Regions won a judgment against MK Investing for $1,505,145.93. (Doc. 936-1 in 8:12-cv-1837-EAK)

worth $370,500 in a Delaware LLC called 785 Holdings) to MIK Advanta, LLC (MIKA), another company in Marvin's IRA and managed by Marvin.

In this fraudulent-transfer action, Regions sues (Doc. 48) to void the transfers to Kathryn and MIKA from the Kaplan entities and MKI. Defending the transfers, Marvin and the Kaplan entities contend principally that the transfers to Kathryn and MIKA constitute "loans," repaid with interest. According to the Kaplans, Kathryn and MIKA repaid the "loans" by paying the attorney's fee incurred by the Kaplan entities in defending the 2012 action. A May 2018 bench trial produced the following evidence and testimony and established the following facts by at least a preponderance.[2]

## DISCUSSION

**I. The transfers to Kathryn**

In the trial of the 2012 action, Marvin either could not say or omitted to say whether the Kaplan entities lent money to Kathryn.[3] (For example, Tr. Trans. at 337, 405–06 and 409) At times, Marvin testified to a "possibility" the transactions were loans. At one moment, Marvin testified: "I made her a loan if it was a loan." (Tr. Trans. at 337) Cross-examined by Regions on May 17, 2016 — the day Kathryn wired more than $700,000 to the Parrish law firm as a purported payment of the Kaplan entitities' attorney's fee — Marvin said he didn't know the interest rate for

---

[2] Additionally, this order fully adopts Regions' proposed findings of fact. (Doc. 210 at 1–16)

[3] The parties agree that Kathryn is an "insider" of the Kaplan entities under Florida's Uniform Fraudulent Transfer Act.

- 2 -

the loans, didn't know the maturity date for the loans, and didn't know if Kathryn repaid the loans.[4] (Tr. Trans. at 404 and 410)

Asked about his testimony in the trial of the 2012 action, Marvin stated: "I wasn't sure at the time [if the transactions were loans] . . . [b]ut it was a loan, it turned out to be a loan." (Tr. Trans. at 337) During discovery in the 2012 action and in the initial disclosures in this action, the Kaplan parties failed to disclose the papers documenting the transfers from Kathryn to the Parrish law firm (Tr. Trans. at 394), a failure that suggests an attempt to conceal the transfers from Regions. In sum, Marvin's cagey testimony and the Kaplan entities' conduct displays a protracted pattern of equivocation, obfuscation, evasion, and duplicity.

The documentary evidence decisively supports Regions. For example, in a 2015 tax return that Marvin signed under penalty of perjury, TNE reported distributing $178,077 to Kathryn. (Kaplan Ex. 19) But in 2017 Marvin amended the tax return to categorize the money as a "loan" rather than a "distribution."[5] Similarly, an R1A Palms tax return — amended after Regions sued to void the transfers — re-characterizes as "loans" the $306,129 in "distributions" to Kathryn. (Kaplan Ex. 18) An amended return for BNK Smith follows the same pattern and claims $44,710 in "loans" rather than "distributions." (Kaplan Ex. 17) The

---

[4] On May 3, 2018, the Supreme Court of Florida suspended Jon Parrish from practicing law in Florida for three years based on Parrish's conduct ostensibly unrelated to the Kaplan litigation.

[5] Although Marvin blames his accountant for purportedly botching the original tax return, Marvin testified that he "probably [did] not" read the amended return before signing. (Tr. Trans. at 344–46)

- 3 -

amended tax returns strongly evidence that the Kaplan parties concocted the loan defense years after the transfers in a distressed attempt to defeat Regions' meritorious fraudulent-transfer claims.[6]

Marvin contended that the Kaplan entities lent money to Kathryn because the Kaplan entities lacked bank accounts and could not pay their debts directly. (For example, Tr. Trans. at 398) But the Kaplan entities wrote (or more accurately, Marvin wrote on the Kaplan entities' behalf) checks from the Kaplan entities' bank accounts to Kathryn, and Marvin cannot explain why the Kaplan entities declined to write checks directly to the Kaplan entities' creditors. In any event, Marvin conceded that the Kaplan entities maintained bank accounts at the time of the purported loans (Tr. Trans. at 334, 361, and 587), a concession that belies Marvin's proffered explanation for the transfers. Confronted with evidence of the Kaplan entities' bank accounts, Marvin testified that the Kaplan entities chose to lend the money to Kathryn, but Marvin offered no cogent explanation for preferring a circuitous movement of money over the direct satisfaction of a debt. (For example, Tr. Trans. at 362–63)

---

[6] No documents contemporaneous with the transactions evidence a loan from the Kaplan entities to Kathryn, and Marvin admits that Kathryn executed no promissory note or other instrument that evidences a loan. (Tr. Trans. at 367) Marvin purportedly felt no need to document a transaction between Kathryn and the Kaplan entities because of the close relation between Kathryn and the Kaplan entities, but at trial Regions identified at least one instance in which one of Marvin's companies documented a transaction with a "closely held" affiliate. (Tr. Trans. at 235) Marvin later testified unpersuasively to a vague recollection that the transaction might have involved a "third-party member." (Tr. Trans. at 471)

- 4 -

Marvin and Kathryn testified unpersuasively to repaying the debt to the Kaplan entities through the payment of the Kaplan entities' attorney's fee. The attorney's fee for the Kaplan entities totaled no more than — and likely much less than[7] — $504,352.11. (Regions Ex. 230) But Kathryn wired more than $700,000 to Parrish's trust account, and the Kaplans cannot explain why Kathryn wired the law firm several hundred-thousand dollars more than the Kaplan entities owed the firm. Parrish wired the excess money to the trust account of David Rosenberg (another lawyer for the Kaplans), and Marvin claimed that Rosenberg's trust held the money for Kathryn. (Tr. Trans. at 453) Asked why Kathryn elected not to retain the surplus money, Marvin offered this bizarre response: "Just wanted to make sure the money was paid back and it was easy to see." (Tr. Trans. at 454) Rather than ease an observer's mind, the confusing and circuitous conveyances emit the unmistakable odor of fraud.[8] In sum, the Kaplan entities' transfers to Kathryn satisfy most of the "badges of fraud" in Section 726.105(2), Florida Statutes, and compel finding the transfers actually fraudulent.

---

[7] The Kaplans state that the legal fees purportedly paid by Kathryn covered not just the payment for services to the Kaplan entities but undivided services to Marvin individually and to several other companies either owned or managed by Marvin. (For example, Tr. Trans. at 360) Marvin cannot identify the portion of the transfers from Kathryn and MIKA that satisfied the Kaplan entities' attorney's fee. (Tr. Trans. at 429)

[8] Even if Kathryn repaid the purported "loans" through the payment of the Kaplan entities' attorneys' fees, nothing in Florida's fraudulent-transfer statute absolves a transferee of liability based on the purported repayment of a fraudulent transfer. *Cf. In re. Davis*, 911 F.2d 560 (11th Cir. 1990) (holding that the fraud exception in the Bankruptcy Code bars the discharge of a fraudulent debt later repaid).

In addition to proving actual fraud by (at least) a preponderance, Regions proved the transfers constructively fraudulent. Kathryn provided no collateral for the "loans" and provided no value for the "loans." The transfers to Kathryn depleted the Kaplan entities' bank accounts (Doc. 162 at 38) and left the Kaplan entities with few, if any, valuable assets. Under Section 726.109(2)(a), Kathryn's receipt of the actually and constructively fraudulent transfers entitles Regions to a money judgment against Kathryn for $742,523, the sum of the transfers.[9]

## II. MKI's transfers to MIKA

### A. The $73,973.21 "loan"

On October 19, 2015, MKI transferred $73,973.21 to MIKA, and the Kaplan parties contend that MKI lent the money to MIKA.[10] Marvin concedes that MKI received no value from MIKA in return for the "loan." (Tr. Trans. at 377–78) At the time of the transfer, MKI's assets comprised counter-claims against Regions and cross-claims against the Smith parties, who were the Kaplan parties' co-defendants in the 2012 action. (Tr. Trans. at 379) MKI won a judgment against the Smith parties for more than $7 million dollars, but Regions defeated MKI's counterclaims.

The credible testimony and the other evidence show that MKI's judgment against the Smith parties is worthless. Asked in a deposition about MKI's assets at

---

[9] To the extent Kathryn asserts a good-faith defense, the evidence and the credible testimony refute that defense.

[10] Marvin cannot remember why MKI "loaned" nearly $74,000 to MIKA but offers two possibilities: "I'm sure [MIKA] had to buy something" or "[MIKA] had expenses, we had probably a lot of expenses." (Tr. Trans. at 377)

- 6 -

the time of the transfer to MIKA, Marvin neglected to mention the claims (Tr. Trans. at 379–80), a startling oversight in view of Marvin's contention that the value of the judgment against the Smiths exceeds the value of the paper on which the judgment was printed. MKI neither attempted to enforce the judgment by execution and levy nor undertook to investigate the Smith parties' assets — hardly the response expected from a judgment creditor possessing a plausible prospect for a payday. Because MIKA provided no value for the transfer, which depleted MKI's assets, the transfer is constructively fraudulent.[11]

**B. The assignment to MIKA of MKI's interest in 785 Holdings**

Contrary to the parties' stipulation, at trial Marvin denied that MKI owned an interest in 785 Holdings. (Tr. Trans. at 560–66) Confronted with documentary evidence of MKI's transfer to MIKA of an interest in 785 Holdings (for example, Regions. Ex. 66), Marvin denied the accuracy of the documents and claimed that Advanta, the IRA administrator, forced him to sign the documents. (Tr. Trans. at 565–66) Like the majority of Marvin's testimony, the denial lacks credibility. In any event, the parties stipulated that MKI assigned its interest in 785 Holdings to MIKA,[12] and this order defers to the stipulation, which comports with the evidence

---

[11] Also, for the reasons explained elsewhere in this order and in Regions' proposed findings of fact, Regions proved MKI's transfer of the $73,973.21 actually fraudulent.

[12] Doc. 162 at 35 ¶ 21(c).

and the credible testimony.[13] Regions proved by (at least) a preponderance that MKI's assignment of 785 Holdings, which Marvin valued at $370,500 (Regions Ex. 62), is both actually and constructively fraudulent.

In a final attempt to defeat the fraudulent-transfer claim based on the transfer of MKI's interest in 785 Holdings, the Kaplan parties cite 6 Del. C. § 18-703, which requires satisfying a judgment against a member of an LLC through a charging order and not through levy or execution on the LLC's property.[14] (The "exclusive remedy" of a charging order protects LLC members other than the judgment debtor from levy on the LLC's assets.) Florida's Uniform Fraudulent Transfer Act permits voiding the fraudulent transfer of an asset, which excludes a judgment debtor's property "to the extent [the property] is generally exempt under nonbankruptcy law."[15] According to the Kaplans, the "exclusive remedy" of the charging order operates to exclude Regions' access to MIKA's interest in 785 Holdings. Stated somewhat differently,

---

[13] At trial, Marvin admitted an inability to identify a document that conveys MKI's 49.4% interest in 785 Holdings to the IRA. (Tr. Trans. at 549–50, 552) Asked about an Advanta email that mentioned a contemplated assignment of the TNE note from MKI to the IRA, Marvin said:

> That's what it did, it assigned its interest in the note and mortgage to 785 Holdings, 785 Holdings — I'm sorry, not 785 Holdings. Assignment of — this is August 10th. Yeah, it would have assignment of mortgage drafted — yeah, this was — I don't know what it's referring to here. It must be referring — oh, with a balance of the Triple Net note. This is when the Triple Net was closed out, yes.

(Tr. Trans. at 505) Confused and confusing, this testimony and Marvin's other attempts to repudiate the stipulation deserve no weight.

[14] In any event, this resolution of this argument appears inconsequential because MIKA succeeded to MKI's debt. (*See infra* Section III) In other words, the money judgment against MIKA for succeeding to MKI's $1.5 million debt to Regions dwarfs the $370,500 at issue in paragraph 27(c) of the complaint.

[15] Section 726.102(2)(b), Florida Statutes.

the Kaplan parties argue that Delaware corporate law immunizes a fraudulent transfer from the Uniform Fraudulent Transfer Act so long as the judgment debtor transfers wealth through the vehicle of an interest in a Delaware LLC.  If the Kaplans' argument were correct, every fraudster (and probably most debtors) would flock to the mechanism of an interest in a Delaware LLC.  The more sensible view — adopted by the persuasive weight of authority in resolving either this issue or a similar question about the application of the Uniform Fraudulent Transfer Act to an LLC — is that no law (of Delaware or of any other state) permits fraudulently transferring with impunity an interest in an LLC.[16]  Although the charging order against a distribution is the "exclusive remedy" through which Regions can attempt to collect on an LLC interest owned by a judgment debtor, Regions is not yet a judgment creditor of MIKA (in other words, Section 18-703 lacks application at this moment).  Actually and constructively fraudulent, MKI's transfer of the $370,500 interest in 785 Holdings entitles Regions to a money judgment (presumably convertible in Delaware to a charging lien or another enforceable mechanism) against MIKA for $370,500.

### C. Transfer of $214,711.30 from the IRA to MIKA

In fall 2012, MKI redeemed units held by the IRA for $196,433.30 in cash, which MKI remitted to the IRA.  Also, MKI distributed $18,278 to the IRA.  Despite

---

[16] *See, e.g., Sky Cable, LLC v. DirecTV,* Inc., 886 F.3d 375, 385–89 (4th Cir. 2018) (Keenan, J.); *Fed. Nat'l Mortg. Ass'n v. Grossman*, 2014 WL 4055371 (D. Minn. Aug. 15, 2014).

disclaiming in footnote thirteen an argument that these transactions are fraudulent,[17] Regions attempts to challenge the disposition of the money, which the IRA transferred to MIKA on October 22, 2012. Because Regions secured a judgment against MKI and not against the IRA in the 2012 action, Region's fraudulent-transfer claims based on the IRA's movement to MIKA of MKI money are foreclosed by Regions' concession in footnote thirteen.

Attempting to salvage the fraudulent-transfer claim based on the IRA's transfer of the $214,711.30 to MIKA, Regions cites *Wiand v. Wells Fargo Bank, N.A.*, 86 F.Supp.3d 1316, 1327–29 (M.D. Fla. 2015), which involves a debtor's transfer of money from one account to another. Because a transfer requires a debtor to "part with" an asset and because the debtor in *Wiand* controlled the money at all times, *Wiand* finds no transfer under the Uniform Fraudulent Transfer Act. Unlike in *Wiand*, MKI's money became inaccessible to MKI after the transfer to the IRA. In sum, Regions' concession in footnote thirteen precludes success on the fraudulent transfer claims for the $214,711.30.

## III. MIKA's liability for MKI's debt

Attempting to subject MIKA to liability for MKI's debt, Regions claims "de facto merger," "mere continuation," and "fraud" under Florida law.[18] These similar

---

[17] Doc. 162 at 34 n.13.

[18] Several times in the trial, Marvin's testimony suggested a flouting of, or disregard for, the corporate form. Explaining the movement of money from one corporation he managed to another corporation he managed, Marvin stated: "You take the money from one entity and you put it where you need it to go, either if it's from your personal account to the LLCs or the LLCs to your personal

(continued...)

- 10 -

and occasionally overlapping claims ask in effect whether a new corporation replaced an older, debt-laden corporation. *See, e.g.*, *Lab Corp. of Am. v. Prof'l Recovery Network*, 813 So. 2d 266, 270 (Fla. 5th DCA 2002). Success on any of these three claims entitles Regions to collect from MIKA the $1,505,145.93 judgment entered for Regions and against MKI in the 2012 action.

### A. De facto merger

The Florida decisions appear to require dissolution of the first corporation even if the corporation no longer operates. For example, *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 153–54 (Fla. 4th DCA 1994), appears to reject a de facto merger claim because "the technical requirement of dissolution of the predecessor corporation was not established," even though the evidence suggested that the first corporation "essentially ceased operations." Although dormant, MKI remains in existence, which under Florida law defeats the de facto merger claim.

### B. Mere continuation

If a company merely continues another company's business under a different name but with the same ownership, assets, and personnel (among other items), Florida law subjects the successor company to liability for the former company's debt. *See, e.g.*, *Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 Fed.Appx. 610 (11th Cir. 2008) (applying Florida law and collecting decisions). In this instance,

---

[18](...continued)
account." (Tr. Trans. at 339) Marvin states in the next breath that he "true[s] up at the end of the year," but the documentary evidence belies the contention that Marvin "true[d] up" after the transfers to Kathryn and MIKA.

Regions proved by (at least) a preponderance that MIKA merely continued MKI's business under a new guise. Marvin managed the two companies, which both operate from Marvin's personal office and transact the same business. (Doc. 162 at 36) As explained elsewhere in this order, MIKA received and deployed MKI's assets, and Marvin owned both companies through the IRA. The shared assets, office, management, and ownership confirm Regions' claim that MIKA amounts to a "mere continuation" of MKI under a different name.

### C. Fraud

Finally, Regions requests a declaration that MIKA is nothing more than a "fraudulent effort" by MKI to hinder Regions' attempts to satisfy the judgment in the 2012 action. Based on the testimony and the evidence discussed elsewhere in this order, Regions proved that MIKA more likely than not amounts to a fraudulent attempt to preclude Regions' collecting on the MKI judgment.

## IV. Injunction

As explained throughout this order, the Kaplan parties' conduct displays a protracted pattern of evasion that demonstrates the necessity for an injunction under Section 726.108(c)(1) against another disposition by MKI or MIKA of an interest in 785 Holdings.[19] MK Investing and MIK Advanta, LLC, must not transfer an interest in 785 Holdings, LLC.

---

[19] If Kathryn, MKI, MIKA, or a Kaplan entity fraudulently transfers money to a third party, Regions can obtain a money judgment against the transferee, a legal remedy that forecloses the equitable remedy of an injunction. (Doc. 113 at 6)

**CONCLUSION**

At trial, Marvin blamed his accountant, his lawyers, and his IRA custodian for supposedly erroneous paperwork that largely supports Regions' claims. At times, Marvin faulted Advanta for the allegedly inaccurate documents and claimed that Advanta forced Marvin to create MIKA and that Advanta invented from whole cloth the valuations that Marvin verified, often under penalty of perjury. Based on Marvin's confusing, implausible, and often contradictory testimony and based on the contemporaneous papers, which were approved when the Kaplan parties faced no prospect of an adverse judgment for a fraudulent transfer and which largely refute the Kaplans' assertions, I reject the Kaplan parties' defenses and conclude that Regions proved the fraudulent-transfer claims (excepting the claim based on the IRA's transfer to MIKA of the $214,711.30 and excepting the de facto merger claim in count fourteen).[20]

The clerk is directed to enter separately the following judgments:

(1) Judgment for Regions Bank and against Kathryn Kaplan in the amount of $742,543.

---

[20] Although Regions names Marvin as a defendant, the record reveals no reason to subject Marvin to liability for the Kaplan entities' transfers or for MKI's transfers to MIKA. Regions won a judgment in the 2012 action against MKI and the Kaplan entities, not against Marvin. Regions mentions an April 10, 2017 order denying the Kaplan parties' motion to dismiss, which order observes that the "predominant weight of authority holds that a plaintiff can sue the beneficiary of a self-directed IRA for the IRA's alleged wrongdoing because the self-directed IRA is not a separate legal entity from its owner." (Doc. 79 at 3 (internal quotation omitted)) Although correct, the observation lacks application in this action because Regions' concession in footnote thirteen forecloses a fraudulent-transfer claim based on the IRA's transfer of money to MIKA. The IRA owned units of MKI and MIKA, but an IRA's ownership of an LLC provides no basis for subjecting the IRA beneficiary to liability for a fraudulent transfer to or from the LLC.

(2) Judgment for Regions Bank and against MIK Advanta, LLC, in the amount of $1,505,145.93.

After entering judgment, the clerk must close the case.

ORDERED in Tampa, Florida, on August 17, 2018.

/s/ Steven D. Merryday
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE